**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

EVANSTON INSURANCE COMPANY as subrogee of 7 CANNONBURY LANE, LLC and PETER MORTIMER,

Plaintiff,

v.

BLUE FLAG CONSTRUCTION, LLC, TOM NEVERS MILLWORKS, INC., ISLAND ENERGY SERVICES, INC. d/b/a YATES ISLAND GAS, and GASHI CONSTRUCTION, INC.

Defendants.

Civil Action No.: 1:25-cv-10454-ADB

**Leave to file granted on 11/18/25**

# AMENDED COMPLAINT

Plaintiff, Evanston Insurance Company as subrogee of 7 Cannonbury Lane, LLC and Peter Mortimer, brings this action against Defendants, Blue Flag Construction, LLC, Tom Nevers Millworks, Inc., Island Energy Services, Inc. d/b/a Yates Island Gas, and Gashi Construction, Inc. avers the following in support thereof:

## PARTIES

1. Plaintiff, Evanston Insurance Company (hereinafter "Evanston" or "Plaintiff") as subrogee of 7 Cannonbury Lane, LLC and Peter Mortimer (hereinafter "Plaintiff's Insureds"), is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 10275 W. Higgins Road, Suite 750, Rosemont, IL 60018.

2. Defendant, Blue Flag Construction, LLC (hereinafter "Blue Flag"), is a limited liability company organized and existing under the laws of the Commonwealth of

Massachusetts with a principal place of business located at 867 Boylston Street, Suite 400, Boston, MA 02116.

3. Defendant, Tom Nevers Millworks, Inc. (hereinafter "Nevers"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 3 Marion Street, Nantucket, MA 02584.

4. Defendant, Island Energy Services, Inc. d/b/a Yates Island Gas (hereinafter "Yates"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 11 Industry Road, Nantucket, MA 02554.

5. Defendant, Gashi Construction, Inc. (hereinafter "Gashi"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 61 Old South Road, Suite 202, Nantucket, MA 02554.

## JURISDICTION

6. The United State District Courts for the District of Massachusetts has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 exclusive of interest and costs and is between citizens of different states.

## GENERAL ALLEGATIONS

7. At all times material hereto, Plaintiff's Insureds were the owners of a residence and the improvements thereon located at 7 Cannonbury Lane, Nantucket, MA 02564 (hereinafter the "Property").

8. At all times relevant hereto, Evanston was authorized to issue and administer insurance policies in the Commonwealth of Massachusetts.

9. At all times relevant hereto, Evanston provided property insurance to Plaintiff's Insureds for the Property and the contents therein pursuant to a policy of insurance, policy number SHD00000669484 (hereinafter the "Policy").

10. Upon information and belief, Defendant Blue Flag was the general contractor for the construction of the Property.

11. Upon information and belief, construction of the Property began in 2021 and was completed sometime in or after the spring of 2022.

12. Upon information and belief, Defendant Nevers was subcontracted by Defendant Blue Flag to perform construction work at the Property including, but not limited to, the construction of a wooden pergola (hereinafter the "Pergola") located in the rear yard of the Property.

13. Upon information and belief, Defendant Gashi was subcontracted by Defendant Nevers to perform construction work at the Property including, but not limited to, the construction of a wooden pergola (hereinafter the "Pergola") located in the rear yard of the Property.

14. Upon information and belief, Defendant Yates was contracted by Blue Flag to perform services related to the delivery and use of propane gas at the Property both during and subsequent to its original construction.

15. Upon information and belief, Defendant Yates installed a propane gas line (hereinafter the "Propane Line") underground in the rear yard of the Property during

original construction sometime prior to the Spring of 2022, but the Propane Line was not pressurized or connected to any propane related appliance at that time.

16. Upon information and belief, Defendants Nevers and/or Gashi constructed the Pergola in the rear yard of the Property following the installation of the Propane Line.

17. Upon information and belief, Defendants Nevers and/or Gashi construction of the Pergola included the installation of four (4) vertical column supports, more commonly known as "Diamond Piers," which include steel rods that are driven into the ground for the purpose of supporting the entire structure of the Pergola.

18. Upon information and belief, a steel rod from one (1) of the Diamond Piers punctured the Propane Line when it was driven into the ground by Nevers.

19. Upon information and belief, Defendant Yates was hired to install a propane fire pit (hereinafter the "Fire Pit") in the rear yard of the Property.

20. Upon information and belief, on or about May 30, 2023, Defendant Yates connected the Fire Pit to and pressurized the Propane Line so that propane gas would flow to it.

21. Upon information and belief, propane gas began leaking continuously from the punctured Propane Line immediately upon being pressurized by Defendant Yates.

22. On or about April 6, 2023, propane gas that had leaked from the Propane Line ignited and caused an explosion resulting in a fire loss throughout the Property causing significant damages (hereinafter the "Fire Loss").

23. As a result of the Fire Loss, Plaintiff's Insureds sustained substantial damages to the Property and the contents therein.

24. As a result of the Fire Loss, and pursuant to the Policy issued to Plaintiff's Insureds, Plaintiff made payments to, or on behalf of Plaintiff's Insureds in excess of $2,569,815.54.

25. By virtue of the payments made to, or on behalf of Plaintiff's Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably and contractually subrogated to the rights of Plaintiff's Insureds as against Defendants, Blue Flag Construction, LLC, Tom Nevers Millworks, Inc., Island Energy Services, Inc. d/b/a Yates Island Gas, and Gashi Construction, Inc. to the extent of said payments.

**COUNT I – NEGLIGENCE**
**PLAINTIFF v. BLUE FLAG CONSTRUCTION, LLC**

26. Plaintiff incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein at length.

27. Defendant Blue Flag had a duty to exercise reasonable care in the work performed at the Property, and to ensure the work was performed in a good and workmanlike manner that did not create a risk of damage to the Property and in accordance with all local, state and federal laws, rules, regulations and codes, industry standards and codes, as well as in accordance with all relevant plans and specifications.

28. The Fire Loss and resulting damages were caused by the negligence, carelessness, negligent acts and/or omissions of Defendant Blue Flag, either acting independently and/or by and through its agents, servants, workmen, employees and/or subcontractors acting within the scope of their employment, both generally and specifically by, among other things:

a. Failing to exercise reasonable care in the supervision and/or inspection of the work performed by its employees, agents, servants, workmen and/or subcontractors;

b. Failing to adequately oversee and/or supervise the construction of the Pergola at the Property by Defendant Nevers;

c. Failing to adequately oversee and/or supervise the installation of the Diamond Piers for the Pergola at the Property by Defendant Nevers;

d. Failing to ensure that Defendant Nevers was qualified to construct the Pergola and/or install the Diamond Piers for the Pergola at the Property;

e. Failing to ensure that the Pergola was constructed in a manner that did not pose a foreseeable risk of harm to persons or property;

f. Failing to ensure that the Diamond Piers for the Pergola were installed in a manner that did not pose a foreseeable risk of harm to persons or property;

g. Failing to ensure that the Pergola at the Property was properly constructed;

h. Failing to ensure that the Diamond Piers for the Pergola at the Property were properly installed;

i. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors complied with any and all industry-wide standards and/or trade practices;

j. Failing to perform its work so as not to create a foreseeable risk of harm to persons or property;

k. Permitting a defective and dangerous condition to exist that created an unreasonable risk of harm to the Property, of which Defendant knew or in the exercise of reasonable care, should have known;

l. Negligently, carelessly and/or improperly permitting the improper construction of the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

m. Negligently, carelessly and/or improperly permitting the improper installation of the Diamond Piers for the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

n. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly constructed the Pergola and/or installed the Diamond Piers for the Pergola at the Property;

o. Failing to reasonably anticipate that negligently, carelessly and/or recklessly performing work at the Property could cause a fire loss;

p. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors complied with any and all applicable statutes, ordinances, codes and/or laws of the Commonwealth of Massachusetts, the County of Nantucket and/or the Town of Nantucket;

q. Permitting the construction of the Pergola and/or the installation of the Diamond Piers for the Pergola in a manner which punctured the Propane Line at the Property;

r. Taking inadequate measures to prevent the puncturing of the Propane Line while constructing the Pergola and/or installing the Diamond Piers for the Pergola at the Property;

s. Failing to act reasonably under all of the circumstances; and

t. Such other acts or omissions that will be revealed during discovery.

29. As a direct, proximate, and foreseeable result of the negligence of Defendant Blue Flag, as described above, the Fire Loss at the Property occurred causing significant damages to the Property and its contents therein.

30. As a direct, proximate, and foreseeable result of the negligence of Defendant Blue Flag, as described above, Plaintiff's Insureds sustained damages in an amount in excess of the jurisdictional limits of this Court.

31. As a direct, proximate, and foreseeable result of the negligence of Defendant Blue Flag, as described above, Plaintiff made payments to, or on behalf of, Plaintiff's Insureds in an amount in excess of $2,569,815.54.

32. By virtue of the payments made to, or on behalf of, Plaintiff's Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of Plaintiff's Insureds as against Blue Flag Construction, LLC to the extent of said payments.

WHEREFORE, Plaintiff, Evanston Insurance Company, as subrogee of 7 Cannonbury Lane and Peter Mortimer, demands judgment in its favor and against

Defendant, Blue Flag Construction, LLC for compensatory damages in excess of $2,569,815.54 together with interest, attorneys' fees, costs and such other and further relief as the Court deems just and proper.

**COUNT II – BREACH OF CONTRACT**
**PLAINTIFF v. BLUE FLAG CONSTRUCTION, LLC**

33. Plaintiff incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein at length.

34. On or about September 15, 2020, Plaintiff's Insured, Peter Mortimer, entered into a contract with Defendant Blue Flag for the construction of the Property (hereinafter the "Contract"). A true and correct copy of the Contract is attached hereto as Exhibit "A."

35. Pursuant to the Contract, Defendant Blue Flag promised, among other things, to "perform the Project in compliance with and as shown on the Plans and Specifications, except as otherwise expressly set forth in this Agreement. Contractor shall perform the Project in a good and workmanlike manner, and in conformity with applicable laws, orders, rules and regulations."

36. Pursuant to the Contract, Defendant Blue Flag was required to, among other things, construct the Property in compliance with the project plans and specifications, and to complete all work in a good and workmanlike manner.

37. Defendant Blue Flag failed to construct the Property in compliance with the project plans and specifications by, among other things, allowing its subcontractor, Defendant Nevers, to puncture the Propane Line while constructing the Pergola.

38. Defendant Blue Flag failed to complete all work in a good and workmanlike manner by, among other things, allowing its subcontractor, Defendant Nevers, to puncture the Propane Line while constructing the Pergola.

39. Defendant Blue Flag, either acting independently and/or by and through its agents, servants, workmen, employees and/or contractors acting within the scope of their employment, breached the agreement with Plaintiff's Insureds by, among other things:

a. Failing to construct the Property in compliance with the project plans and specifications;

b. Failing to complete the work of constructing the Property in a good and workmanlike manner;

c. Failing to complete the work of constructing the Property in accordance with any and all applicable laws, orders, rules and/or regulations;

d. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly constructed the Pergola and/or installed the Diamond Piers for the Pergola at the Property;

e. Failing to prevent the puncturing of the Propane Line during construction of the Pergola at the Property; and

f. Such other breaches as revealed in discovery.

40. As a direct, proximate, and foreseeable result of the breaches of the Contract by Defendant Blue Flag, as described above, the Fire Loss at the Property occurred causing significant damages to the Property and its contents therein.

41. As a direct, proximate, and foreseeable result of the breaches of the Contract by Defendant Blue Flag, as described above, Plaintiff's Insureds sustained damages in an amount in excess of the jurisdictional limits of this Court.

42. As a direct, proximate, and foreseeable result of the breaches of the Contract by Defendant Blue Flag, as described above, Plaintiff made payments to, or on behalf of, Plaintiff's Insureds in an amount in excess of $2,569,815.54.

43. By virtue of the payments made to, or on behalf of, Plaintiff's Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of Plaintiff's Insureds as against Blue Flag Construction, LLC to the extent of said payments.

WHEREFORE, Plaintiff, Evanston Insurance Company, as subrogee of 7 Cannonbury Lane and Peter Mortimer, demands judgment in its favor and against Defendant, Blue Flag Construction, LLC for compensatory damages in excess of $2,569,815.54 together with interest, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**COUNT III – NEGLIGENCE**
**PLAINTIFF v. TOM NEVERS MILLWORKS, INC.**

44. Plaintiff incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein at length.

45. Defendant Nevers had a duty to exercise reasonable care in the work performed at the Property, and to ensure the work was performed in a good and workmanlike manner that did not create a risk of damage to the Property and in accordance with all local, state and federal laws, rules, regulations and codes, industry standards and codes, as well as in accordance with all relevant plans and specifications.

46. The Fire Loss and resulting damages were caused by the negligence, carelessness, negligent acts and/or omissions of Defendant Nevers, either acting independently and/or by and through its agents, servants, workmen, employees and/or subcontractors acting within the scope of their employment, both generally and specifically by, among other things:

a. Failing to perform work in a careful and workmanlike manner;

b. Utilizing employees, workmen and/or subcontractors which Defendant knew, or in the exercise of reasonable care should have known, were not properly trained for the work to be performed at the Property;

c. Failing to exercise reasonable care in the supervision and/or inspection of the work performed by its employees, agents, servants, workmen and/or subcontractors;

d. Failing to comply with any and all industry-wide standards and/or trade practices;

e. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors complied with industry-wide standards and/or trade practices;

f. Failing to perform its work so as not to create a foreseeable risk of harm to persons or property;

g. Permitting a defective and dangerous condition to exist that created an unreasonable risk of harm to the Property, of which Defendant knew or in the exercise of reasonable care, should have known;

h. Negligently, carelessly and/or improperly constructing the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

i. Negligently, carelessly and/or improperly installing the Diamond Piers of the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

j. Negligently, carelessly and/or improperly puncturing the Propane Line while constructing the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

k. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly constructed the Pergola at the Property;

l. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly installed the Diamond Piers for the Pergola at the Property;

m. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors did not puncture the Propane Line while constructing the Pergola at the Property;

n. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors did not puncture the Propane Line while constructing the Pergola at the Property;

o. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors did not puncture the Propane Line while

installing the Diamond Piers for the Pergola at the Property;

p. Failing to reasonably anticipate that negligently, carelessly and/or recklessly performing work at the Property could cause a fire loss;

q. Disregarding, ignoring, failing to comply with and/or violating all applicable statutes, ordinances, codes and/or laws of the Commonwealth of Massachusetts, the County of Nantucket and/or the Town of Nantucket;

r. Taking inadequate measures to prevent the puncturing of the Propane Line while installing the Diamond Piers for the Pergola at the Property;

s. Failing to act reasonably under all of the circumstances; and

t. Such other acts or omissions that will be revealed during discovery.

47. As a direct, proximate, and foreseeable result of the negligence of Defendant Nevers, as described above, the Fire Loss at the Property occurred causing significant damages to the Property and its contents therein.

48. As a direct, proximate, and foreseeable result of the negligence of Defendant Nevers, as described above, Plaintiff's Insureds sustained damages in an amount in excess of the jurisdictional limits of this Court.

49. As a direct, proximate, and foreseeable result of the negligence of Defendant Nevers, as described above, Plaintiff made payments to, or on behalf of, Plaintiff's Insureds in an amount in excess of $2,569,815.54.

50. By virtue of the payments made to, or on behalf of, Plaintiff's Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally,

equitably, and contractually subrogated to the rights of Plaintiff's Insureds as against Tom Nevers Millworks, Inc. to the extent of said payments.

WHEREFORE, Plaintiff, Evanston Insurance Company, as subrogee of 7 Cannonbury Lane and Peter Mortimer, demands judgment in its favor and against Defendant, Tom Nevers Millworks, Inc. for compensatory damages in excess of $$2,569,815.54 together with interest, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**COUNT IV – NEGLIGENCE**
**PLAINTIFF v. ISLAND ENERGY SERVICES, INC. d/b/a YATES ISLAND GAS**

51. Plaintiff incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein at length.

52. Defendant Yates had a duty to exercise reasonable care in the work performed at the Property, and to ensure the work was performed in a good and workmanlike manner that did not create a risk of damage to the Property and in accordance with all local, state and federal laws, rules, regulations and codes, industry standards and codes, as well as in accordance with all relevant plans and specifications.

53. The Fire Loss and resulting damages were caused by the negligence, carelessness, negligent acts and/or omissions of Defendant Yates, either acting independently and/or by and through its agents, servants, workmen, employees and/or subcontractors acting within the scope of their employment, both generally and specifically by, among other things:

a. Failing to perform work in a careful and workmanlike manner;
b. Utilizing employees, workmen and/or subcontractors which Defendant knew, or in the exercise of reasonable care should have

known, were not properly trained for the work to be performed at the Property;

c. Failing to exercise reasonable care in the supervision and/or inspection of the work performed by its employees, agents, servants, workmen and/or subcontractors;

d. Failing to comply with any and all industry-wide standards and/or trade practices;

e. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors complied with industry-wide standards and/or trade practices;

f. Failing to perform its work so as not to create a foreseeable risk of harm to persons or property;

g. Permitting a defective and dangerous condition to exist that created an unreasonable risk of harm to the Property, of which Defendant knew or in the exercise of reasonable care, should have known;

h. Negligently, carelessly and/or improperly installing the Fire Pit connected to the Propane Line, thereby creating an unreasonable risk of harm to the Property;

i. Failing to adequately inspect the Propane Line for leaks prior to or subsequent to pressurizing it with propane for use with the Fire Pit at the Property;

j. Failing to discover that the Propane Line had been punctured prior to or subsequent to pressurizing it for use with the Fire Pit at the

Property;

k. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly inspected the Propane Line for leaks prior or subsequent to the installation of the Fire Pit at the Property;

l. Failing to reasonably anticipate that negligently, carelessly and/or recklessly performing work at the Property could cause a fire loss;

m. Disregarding, ignoring, failing to comply with and/or violating all applicable statutes, ordinances, codes and/or laws of the Commonwealth of Massachusetts, the County of Nantucket and/or the Town of Nantucket;

n. Taking inadequate measures to discover the puncture in the Propane Line prior or subsequent to the installation of the Fire Pit at the Property.;

o. Failing to act reasonably under all of the circumstances; and

p. Such other acts or omissions that will be revealed during discovery.

54. As a direct, proximate, and foreseeable result of the negligence of Defendant Yates, as described above, the Fire Loss at the Property occurred causing significant damages to the Property and its contents therein.

55. As a direct, proximate, and foreseeable result of the negligence of Defendant Yates, as described above, Plaintiff's Insureds sustained damages in an amount in excess of the jurisdictional limits of this Court.

56. As a direct, proximate, and foreseeable result of the negligence of Defendant Yates, as described above, Plaintiff made payments to, or on behalf of, Plaintiff's Insureds in an amount in excess of $2,569,815.54.

57. By virtue of the payments made to, or on behalf of, Plaintiff's Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of Plaintiff's Insureds as against Island Energy Services, Inc. d/b/a Yates Island Gas to the extent of said payments.

WHEREFORE, Plaintiff, Evanston Insurance Company, as subrogee of 7 Cannonbury Lane and Peter Mortimer, demands judgment in its favor and against Defendant, Island Energy Services, Inc. d/b/a Yates Island Gas for compensatory damages in excess of $2,569,815.54. Together with interest, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**COUNT V – NEGLIGENCE**
**PLAINTIFF v. GASHI CONSTRUCTION, INC.**

58. Plaintiff incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein at length.

59. Defendant Gashi had a duty to exercise reasonable care in the work performed at the Property, and to ensure the work was performed in a good and workmanlike manner that did not create a risk of damage to the Property and in accordance with all local, state and federal laws, rules, regulations and codes, industry standards and codes, as well as in accordance with all relevant plans and specifications.

60. The Fire Loss and resulting damages were caused by the negligence, carelessness, negligent acts and/or omissions of Defendant Gashi, either acting independently and/or by and through its agents, servants, workmen, employees and/or

subcontractors acting within the scope of their employment, both generally and specifically by, among other things:

a. Failing to perform work in a careful and workmanlike manner;

b. Utilizing employees, workmen and/or subcontractors which Defendant knew, or in the exercise of reasonable care should have known, were not properly trained for the work to be performed at the Property;

c. Failing to exercise reasonable care in the supervision and/or inspection of the work performed by its employees, agents, servants, workmen and/or subcontractors;

d. Failing to comply with any and all industry-wide standards and/or trade practices;

e. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors complied with industry-wide standards and/or trade practices;

f. Failing to perform its work so as not to create a foreseeable risk of harm to persons or property;

g. Permitting a defective and dangerous condition to exist that created an unreasonable risk of harm to the Property, of which Defendant knew or in the exercise of reasonable care, should have known;

h. Negligently, carelessly and/or improperly constructing the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

i. Negligently, carelessly and/or improperly installing the Diamond Piers of the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

j. Negligently, carelessly and/or improperly puncturing the Propane Line while constructing the Pergola at the Property, thereby creating an unreasonable risk of harm to the Property;

k. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly constructed the Pergola at the Property;

l. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors properly installed the Diamond Piers for the Pergola at the Property;

m. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors did not puncture the Propane Line while constructing the Pergola at the Property;

n. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors did not puncture the Propane Line while constructing the Pergola at the Property;

o. Failing to ensure that its employees, agents, servants, workmen and/or subcontractors did not puncture the Propane Line while installing the Diamond Piers for the Pergola at the Property;

p. Failing to reasonably anticipate that negligently, carelessly and/or recklessly performing work at the Property could cause a fire loss;

q. Disregarding, ignoring, failing to comply with and/or violating all applicable statutes, ordinances, codes and/or laws of the Commonwealth of Massachusetts, the County of Nantucket and/or the Town of Nantucket;

r. Taking inadequate measures to prevent the puncturing of the Propane Line while installing the Diamond Piers for the Pergola at the Property;

s. Failing to act reasonably under all of the circumstances; and

t. Such other acts or omissions that will be revealed during discovery.

61. As a direct, proximate, and foreseeable result of the negligence of Defendant Gashi, as described above, the Fire Loss at the Property occurred causing significant damages to the Property and its contents therein.

62. As a direct, proximate, and foreseeable result of the negligence of Defendant Gashi, as described above, Plaintiff's Insureds sustained damages in an amount in excess of the jurisdictional limits of this Court.

63. As a direct, proximate, and foreseeable result of the negligence of Defendant Gashi, as described above, Plaintiff made payments to, or on behalf of, Plaintiff's Insureds in an amount in excess of $2,569,815.54.

64. By virtue of the payments made to, or on behalf of, Plaintiff's Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of Plaintiff's Insureds as against Gashi Construction, Inc. to the extent of said payments.

WHEREFORE, Plaintiff, Evanston Insurance Company, as subrogee of 7 Cannonbury Lane and Peter Mortimer, demands judgment in its favor and against Defendant, Gashi Construction, Inc. for compensatory damages in excess of

$$2,569,815.54 together with interest, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS AND ISSUES SO TRIABLE**

Respectfully submitted,

The Plaintiff,
Evanston Insurance Company, as subrogee
of 7 Cannonbury Lane, LLC and
Peter Mortimer,

By its attorneys,

O'ROURKE & HAWK, LLC

*/s/ Shawn P. O'Rourke*
Shawn P. O'Rourke, BBO No. 561882
529 Main Street, Suite 214
Charlestown, MA 02129
617-337-3191 (Telephone)
617-337-3194 (Facsimile)
so@orourkehawk.com

LAW OFFICES OF ROBERT A. STUTMAN, P.C.

*/s/ Michael F. Wallace*
Michael F. Wallace (Admitted *Pro Hac Vice*)
20 E. Taunton Road, Suite 403
Berlin, NJ 08009
T: (856) 767-6800
F: (856) 767-6810
wallacem@stutmanlaw.com

Dated: November 19, 2025

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all counsel of record to this action by the Court's ECF filing system this 19th day of November, 2025.

/s/ Michael F. Wallace

# Exhibit A

# RESIDENTIAL CONSTRUCTION AGREEMENT

THIS RESIDENTIAL CONSTRUCTION AGREEMENT (this "**Agreement**") is made this **15th** of **September**, 2020, by and between Peter and Amanda Mortimer having an address of PO Box 1147, Ross, CA 94957] ("**Owner**") and Blue Flag Construction, LLC, a Massachusetts limited liability company, having an address of 105 Newbury Street, Boston MA 02116 ("**Contractor**").

BACKGROUND

A. Owner owns certain land located at 7 Cannonbury Lane Nantucket, MA 02564 (the "**Property**").

B. Owner has requested that Contractor construct a house (the "**House**") and certain other improvements ("**Improvements**") on the Property, and Contractor has agreed to provide all labor, materials and services to construct the House and Improvements in accordance with the plans prepared by Workshop APD (the "**Architect**"), dated [__________], attached hereto as Exhibit A (the "**Plans**"), the Specifications attached hereto as Exhibit B (the "**Specifications**"), and in accordance with the provisions of this Agreement (the "**Project**").

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained and intending to be legally bound hereby, Owner and Contractor agree as follows:

1. SCOPE OF PROJECT. Contractor shall perform the Project in compliance with and as shown on the Plans and Specifications, except as otherwise expressly set forth in this Agreement. Contractor shall perform the Project in a good and workmanlike manner, and in conformity with applicable laws, orders, rules and regulations.

2. PLANS, SPECIFICATIONS, AND CONSTRUCTION DRAWINGS. All Plans and Specifications and other documents prepared by the Architect with respect to the Project are and shall remain the property of Contractor, and Contractor shall retain all common law, statutory and other reserved rights with respect thereto, including all copyrights and other intellectual property rights. Contractor may grant its subcontractors, laborers, suppliers, materialmen, and others performing work on the Project (collectively, "**Subcontractors**") a limited license to use and reproduce applicable portions of the Plans and Specifications and other documents prepared by Contractor and/or the Architect which are appropriate for execution of their respective work. Submittals or distributions necessary to meet official regulatory requirements or for other purposes relating to completion of the Project are not to be construed as a publication in derogation of Contactor's copyright or other reserved rights. Any specifications contained in the Specifications attached hereto Exhibit B shall supersede any conflicting specifications contained in the Plans attached hereto as Exhibit A.

3. COMMENCEMENT AND COMPLETION OF PROJECT.

a. Contractor shall commence construction of the Home and Improvements promptly after receipt of all required permits and approvals from the appropriate governmental authorities (the "**Commencement Date**"). The Project is expected to be substantially completed on or about ten (10 months after the Commencement Date ("**Estimated Completion Date**") with time being of the essence; *provided*, *however*, that the Estimated Completion Date shall be extended by a period of time equal to the aggregate period(s) of time occasioned by delays due to receipt of permits and approvals, material or labor shortages, strikes not limited solely to the workforce of Contractor or its Subcontractors, fires, riots, acts of God, adverse weather conditions uncommon in Nantucket and not reasonably anticipated, governmental acts or requirements, delays beyond Contractor's reasonable control, delays caused by

Owner, including without limitation Change Orders requested by Owner and periods of time in which the Project is suspended by Contractor as a result of Owner's default or late payments ("**Permitted Delays**"). Notwithstanding anything to the contrary contained in this Agreement, for the avoidance of doubt, Owner acknowledges and agrees that the Estimated Completion Date (as extended by Permitted Delays) is not a guaranteed completion date but merely a reasonable estimate made by Contractor as of the date of this Agreement. As the Project nears actual substantial completion (regardless of the Estimated Completion Date), Contractor shall use commercially reasonable efforts to provide Owner with approximately forty-five (45) days' prior notice of the anticipated date of actual substantial completion.

For purposes of this Agreement, "substantial completion" shall be achieved, and the Project shall be deemed "substantially complete", on such date that: (1) the House and Improvements are ready for occupancy as a single family residence (except for "Punchlist" items which do not interfere with the legal, safe, functional and comfortable use and occupancy of the Project or any part of the Project and for which a reserve is established in an amount equal to one hundred twenty-five percent (125%) of the estimated cost of completion), (2) a certificate of occupancy, or a temporary certificate of occupancy, has been issued by the appropriate governmental authority (in the event a temporary certificate is issued, Contractor shall obtain a final certificate of occupancy as soon as is reasonably possible); and (3) all heating, ventilation, electrical and air conditioning, plumbing, storm water and other utility systems are in place in accordance with the Plans and Specifications, and are in good working order.

Prior to taking occupancy, Owner and Contractor shall conduct a walk-through of the Project and make a thorough and complete list of any Project or other items that are not complete or that require correction (the "**Initial Punchlist**"). Contractor shall make reasonable efforts to complete the items on the Initial Punchlist within thirty (30) days following the date that the Initial Punchlist is completed, subject to Permitted Delays. Owner shall schedule a final punchlist walkthrough with a representative of Contractor within ninety (90) days of occupancy. During this walkthrough, a final punchlist (the "**Final Punchlist**" and, together with the Initial Punchlist, the "**Punchlist**") will be created and completed within thirty (30) days of the walkthrough. At that time, requests for paint touch ups due to nail pops and house settling may be submitted to Contractor by Owner. Paint touch-ups due to drywall damage from movers or wear and tear from living in the home shall not be accepted by Contractor.

Contractor shall review samples with Owner prior to starting construction (such as interior and exterior colors, colors and grades of carpeting or other floor coverings, countertops, doors, windows, floor coverings, light fixtures, plumbing fixtures, kitchen appliances, ceramic tile, kitchen cabinets, countertops and vanities and all other similar items to be installed or constructed by Contractor) to be selected by Owner, and which shall be acknowledged in writing by the parties and made part of this Construction Agreement. Such selections shall be made timely by Owner after Owner's receipt of such samples, and shall be final and binding, unless changed by a valid Change Order.

Contractor may substitute materials or equipment different from the Plans and Specifications. However, any substitution of materials or equipment shall require Owner's prior written consent, which consent shall not be unreasonably withheld or delayed by Owner. Owner understands that Owner's failure to approve any proposed substitution may result in a Permitted Delay and delay the Completion Date if the originally specified materials or equipment are not available in a timely manner.

4. CHANGES IN THE PROJECT. No verbal agreement, modification or a promise, alteration or amendment of the Plans and Specifications, or this Agreement, shall be binding upon either party unless made in pursuance of a written change order signed by Owner and Contractor ("**Change Order**"). Neither Contractor nor Owner shall unreasonably withhold or delay its consent to any Change

Order to the Project that does not materially affect the scope of the Project. Any proposed Change Order which increases or decreases the Contract Sum shall be provided to the Owner by the Contractor with an explanation of the reason the Contract Sum will change, the actual change to the Contract Sum, and whether the Completion Date will change as a result of the proposed Change Order.

5. ZONING APPROVALS, PERMITS AND UTILITY APPROVALS. Contractor shall be responsible to obtain all necessary zoning and land development approvals, utility permits and tap-in agreements, building licenses and permits necessary and all other necessary local, county, state and federal permits and approvals necessary for construction and completion of the Project, the cost of which shall be paid for by Contractor. Contractor shall be responsible for the cost of any land development approvals, and to pay any engineering fees in connection therewith. Conractor shall pay directly any connection, capacity, tapping, or other fees required to connect to public sewer or water service.

6. CONTRACT SUM.

a. The cost of the Project shall be an amount equal to two million three hundred sixty-five thousand dollars ($2,365,000.00) (the "**Contract Sum**").

b. Owner shall pay to Contractor, on the date of this Agreement, an amount equal to one hundred ninety-one thousand two hundred fifty dollars($191,250.00) (the "**Deposit**") as a deposit, which Contractor shall apply to the Contract Sum on a percentage basis in accordance with the percentage of completion of the Project.

c. Contractor acknowledges and agrees that the Owner may obtain financing for the construction of the Project from a lender (hereinafter "**Lender**") and that construction loan agreements or similar documents shall or may be required by the Lender to provide such financing, the terms of which may modify some of the terms of this Agreement, including how and when and at what time the Contract Sum shall be paid. Construction financing may provide for direct payment to Contractor by Lender upon submission of invoices and Lender inspection within ten (10) days of Contractor submission to Lender. No payment by Owner or on behalf of Owner to Contractor shall be construed to be an acceptance of noncompliant, defective or incomplete work or materials.

d. Owner shall pay to Contractor the balance of the Contract Sum in accordance with the payment schedule attached hereto as Exhibit C (the "**Payment Schedule**") Payments shall be made at milestones of construction so long as the Buyer's Agent has certified to Owner that the work at each milestone has been completed and Contractor shall provide photos to Owner if Owner is not available to inspect the Property. Contractor shall make an application for payment within 10 days of the date each payments is due pursuant to Exhibit C ("Payment Date"). On or before the Payment Date, the Buyer's agent hall certify to the Owner that the Project is sufficiently complete to warrant payment pursuant to the Milestones on Exhibit C. Upon Certification by the Buyer's Agent that the milestone has been completed, the Owner shall make payment to the Contractor pursuant to Exhibit C.

e. All Change Orders which have resulted in additions to the Contract Sum shall be netted against all Change Orders which have resulted in deductions from the Contract Sum. If the net Change Orders show an increase in the overall Contract Sum, then Contractor shall be entitled to payment for the actual net increase of the Change Orders, plus, for overhead and profit, 15% of the net increase to the Contract Sum. If the net Change Orders result in a decrease in the Contract Sum, then Owner shall be entitled to receive a credit for the actual net decrease of the Change Orders plus, for overhead and profit, 15% of the net decrease to the Contract Sum. Contractor shall keep and present in such form as Architect and Owner may reasonably prescribe, an itemized accounting of actual costs together with appropriate

supporting data. For the purposes of this subsection, actual costs shall be defined and limited to the actual costs set forth in and actually arising out of the Change Order.

f. In addition to any other right or remedy Contractor may have for late payments hereunder or at law, any payments not made in accordance with the Payment Schedule or otherwise when due shall bear interest at the Default Rate (as defined below).

7. CONTRACTOR TO BE INDEPENDENT CONTRACTOR. Contractor shall be considered an independent contractor in the performance of the Project, and nothing herein shall be deemed to create any association, partnership, joint venture, or relationship of principal and agent or employer and employee between Owner and Contractor.

8. LIABILITY INSURANCE. Contractor, throughout the performance of the Project, and until the Project is completed, shall maintain such insurance as shall protect Contractor from claims under Workers' Compensation Acts, from claims of damages for personal injury, including death and from claims for property damage which may arise from operations under this Agreement, each in an amount of not less than $2,000,000.00 per occurrence. All such insurance shall be obtained from reputable companies licensed to do business in the Commonwealth of Massachusetts and shall name Owner as an additional insured. Upon request by Owner, Contractor shall provide Owner with a certificate evidencing the foregoing insurance. Every Subcontractor performing any part of the Project shall maintain such insurance as shall protect it from claims under Workers' Compensation Acts, from claims of damages for personal injury, including death, and from claims for property damage which may arise from the performance of' the Project.

9. BUILDER'S RISK INSURANCE. Owner, at its sole and exclusive discretion, may purchase and maintain a policy of Builder's Risk Insurance, with extended coverage provisions, which shall cover and fully insure the Project under this Agreement, including items of labor and materials connected therewith. If Owner purchases a policy of Builder's Risk Insurance, then Owner and Contractor shall be named jointly as the insured thereunder, and the loss, if any, under the contract of insurance shall be made adjustable to Contractor and Owner as their respective interests may appear.

10. WARRANTY. Upon substantial completion of the Project, Contractor shall provide Owner the limited warranty signed by the Contractor attached hereto as Exhibit D (the "**Warranty**"):

a. Owner expressly agrees that the Warranty is not assignable by Owner, except as may be permitted pursuant to the specific terms of the Warranty.

b. Specifically and without limitation, Contractor is not providing any warranty with respect to any appliances, component equipment or the like which is installed as part of the Project ("**Equipment**"), including without limitation any consumer products (as defined in the Magnuson Moss Warranty Act), whether or not the manufacturer thereof issues a separate warranty, except as to Contractor's workmanship with respect to installation of the Equipment (and Contractor shall assign to Owner all assignable guarantees or warranties extended to Contractor by the manufacturer or seller of any Equipment); and

c. Contractor expressly disclaims any liability for the following and the consequences thereof, except as expressly otherwise set forth below:

(i) ;

(ii) slight discoloration of, or imperfections in, grout, plaster, siding, or stucco;

(iii) Any marks on painted or papered walls, interior or exterior wood work, and exterior wall material after the date that the Project is substantially completed and the Punchlist finalized;

(iv) typical variations in fixtures, flooring, carpet, appliances, stained wood, tile, brick, mortar or stucco;

(v) Any damage that arises out of, or to the extent it is caused by (a) negligence, improper maintenance, or improper operation by Owner, (b) failure by Owner to give prompt and proper notice to Contractor of any defects, after such time that Owner becomes aware of such defects; or (c) changes of the grading of the ground by or at the direction of Owner that do not comply with accepted grading practices or that change the finished grade as established by Contractor;

(vi) Loss or damage externally caused, including, but not limited, to Acts of God, riot or civil commotion, fire, explosion, smoke, water, hail, lightening, falling trees or other objects, aircraft, vehicles, flood, mud slides, earthquakes, volcanic eruption, natural or introduced gases (including radon), abuse or use of the House or Property, or any part thereof, but only to the extent that a high quality single family home of similar cost to that of the Project would have also sustained such loss or damage;

(vii) Any claim reported after the expiration of the Warranty Term;

(viii) Normal wear and tear subsequent to the owner taking possession;

(ix) Dampness or condensation due to failure of Owner to maintain adequate ventilation, or due to improper operation of heating, air conditioning, heat pump, humidifying, and/or dc-humidifying equipment; and

(x) Any loss, damage, defect, cost, or expense which is caused, in whole or in part, by any peril or occurrence for which compensation is covered by insurance or public funds to the extent that such compensation is paid by such providers;

d. **THE WARRANTY IS AND SHALL BE IN LIEU OF ANY OTHER WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF HABITABILITY, GOOD FINISHED WORKMANSHIP, AND/OR FITNESS FOR A PARTICULAR PURPOSE, IT BEING THE INTENT OF THIS AGREEMENT TO REDUCE ALL WARRANTY TERMS TO WRITING.**

e. The parties acknowledge that Radon is a radioactive gas produced naturally in the ground by the normal decay of uranium and radium. Uranium and radium are widely distributed in trace amounts in the earth's crust. Descendants of radon gas are called radon daughters or radon progeny. Several radon daughters emit alpha radiation, which has high energy but short range. Studies indicate the risk of extended exposure to high levels of radon gas/radon daughters is an increased risk of lung cancer. Radon gas originates in soil and rocks. It diffuses (as does any gas) and flows along the path of least resistance to the surface of the ground, and then to the atmosphere. Being a gas, radon can also move into any air space, such as basement and crawl spaces, and permeate throughout the House. If a house has a radon problem, it can usually be mitigated by increased ventilation and/or preventing radon entry. The

EPA advises corrective action if the annual average exposure to radon daughters exceed 0.01 Finished Working levels (4 picocuries per liter). Further information can be secured from the DEP Radon Project Office, 1100 Grosser Road, Gilbertsville, Pennsylvania 19525; 1-800-23RADON, or (610) 369-3590. Contractor does not make any warranties, express or implied, as to the specific radon level to be found in the House.

**OWNER HEREBY RELEASES, QUITCLAIMS AND FOREVER DISCHARGES CONTRACTOR, ITS EMPLOYEES, SUBCONTRACTORS, AND ANY OF THEIR OFFICERS, MEMBERS, OWNERS, OR PARTNERS, AND ANYONE ELSE WHO MAY BE LIABLE BY OR THROUGH THEM OR ANY OF THEM, FOR ANY AND ALL CLAIMS, LOSSES, LIABILITIES, AND DEMANDS, INCLUDING CLAIMS FOR BODILY INJURIES AND ALL THE CONSEQUENCES THEREOF, WHETHER NOW KNOWN OR NOT, THAT MAY ARISE FROM THE PRESENCE OF RADON IN ANY ROOM OR PORTION OF THE HOUSE OR IN ANY OTHER IMPROVEMENTS THAT ARE THE SUBJECT OF THIS AGREEMENT. THIS RELEASE AND DISCLAIMER SHALL SURVIVE COMPLETION OF THE PROJECT.**

DS POM DS am

**Owner initial**

f. **ANY ACTION OR SUIT UNDER THE WARRANTY, OR UNDER ANY OTHER CAUSE OF ACTION ARISING OUT OF THE PROJECT, WHETHER IN TORT OR IN CONTRACT, MUST BE BROUGHT WITHIN ONE (1) YEAR AFTER THE EXPIRATION OF THE WARRANTY TERM, NOTWITHSTANDING ANY OTHERWISE APPLICABLE STATUTE OF LIMITATIONS.**

11. COVENANTS OF OWNER. Until final completion of the Project and receipt by Contractor of the Contract Sum, Owner, and any other person acting for and on behalf of Owner, unless otherwise agreed in writing, shall not, without Contractor's written consent:

a. do or cause to be done any work on or to the House or Property, which interferes with the performance of the Project by Contractor;

b. deliver or cause to be delivered any personal property, materials, or equipment to the Property which would materially interfere with the performance of the Project;

c. assume occupancy of the House;

d. make any payment or give any orders to any workmen, materialmen, or Subcontractors of Contractor; and

e. take or cause to be taken any action that would materially interfere with Contractor's timely performance of the Project.

Owner agrees that if it employs other workers directly to perform work at the House or the Property it shall have express permission of Contractor, which permission shall not be unreasonably withheld, conditioned or delayed.

12. WAIVER AND RELEASE OF MECHANICS' LIENS. Contractor shall execute and deliver to Owner shall execute and deliver to Owner, after full payment of the Contract Sum, a Release and Waiver of Liens, in a form reasonably acceptable to Owner and/or to Owner's Lender.

13. ASSIGNMENT OF CONTRACT RIGHTS. Neither party shall assign any rights under this Agreement or any monies due or to become due hereunder without first obtaining the express written consent of the other party hereto.

14. ARBITRATION. In the event any dispute or disagreement arises among the parties hereto (a "**Claim**"), the Parties agree to reconcile the Claim among themselves. If such Claim cannot be reconciled through good faith negotiation, then the Parties shall submit the Claim to non-binding mediation prior to the commencement of any legal or administrative proceeding. Thereafter, either party may submit such Claim to binding arbitration before the American Arbitration Association. In any arbitration conducted hereunder, the parties intend that reasonable discovery shall be permitted, subject to the discretion of the arbitrator to limit the scope of discovery and to establish a schedule for the conduct of discovery. Without limiting the preceding, such reasonable discovery shall include the mandatory production of documents and exhibits relevant to the applicable Claim, the deposition of parties and witnesses, and the production of reports prepared by any experts whose testimony shall be offered or introduced in the arbitration. In the event either party intends to introduce the testimony of any expert, a summary of the opinion of such expert that shall be introduced shall be provided in writing to all other parties promptly, and in any event within forty-five (45) days prior to the arbitration, and a summary of the opinion of any expert retained to rebut the testimony of any expert proposed to be used by another party shall be furnished to all other parties at least fifteen (15) days prior to the arbitration. The arbitrator shall have the same authority as the Land Court to issue sanctions against a party for failure to afford reasonable discovery and for failure to produce for oral depositions any witnesses that such party intends to use in the arbitration and that the other party desires to depose, such sanctions to include, without limitation, prohibiting the testimony of such witnesses or the introduction of such evidence. Notwithstanding the preceding. a Claim shall not be subject to arbitration under this Agreement if such Claim might otherwise be covered (in whole or in part) by insurance carried by the parties or any other person, and subjecting the resolution of such Claim to binding arbitration would violate the terms of the applicable insurance policy or policies, or would give rise to a defense or basis for denial of coverage by the insurer. In such case, any Claim to which the preceding sentence applies shall be litigated as hereafter provided, and any other Claims shall be subject to binding arbitration.

To the fullest extent permitted by law, this section shall apply to all claims, disputes and matters in any way arising out of this Agreement or the subject matter hereof, including (without limitation) disputes concerning breach of contract, express, statutory and/or implied warranties, bodily injuries and/or illness, mold-related claims, representations and/or omissions by Contractor, on-site and off-site conditions, and all other contractual, tort and statutory causes of action, including any claims under the Massachusetts Consumer Protection Law.

15. NOTICES. Notices hereunder shall be sufficient if in writing and sent by postage prepaid certified or registered mail, reputable overnight carrier or delivered by personal service, addressed:

a. If to Contractor:

Blue Flag Construction, LLC
105 Newbury Street
Boston, MA 02116
Attn: Richard J. Craddock

With a copy to:

Blank Rome LLP
1825 Eye Street, NW

Washington, D.C. 20006
Attn: Brendan D. Delany, Esq.

If to Owner: Peter and Amanda Mortimer
PO Box 1147
Ross, CA 94957

16. HEIRS, SUCCESSORS, AND ASSIGNS. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, and assigns, to the extent assignable.

17. ENTIRE CONTRACT AND CONTRACT DOCUMENTS. All oral discussions, including all representations in each and every matter leading up to the execution of this Agreement are included and contained herein. This Agreement, together with the exhibits attached to this Agreement, form the complete contract between the parties hereto.

18. DEFAULT AND TERMINATION.

a. Owner shall be in default hereunder if Owner (i) fails to pay all or any part of the Contract Sum (or any installment thereof), except any sums that are in dispute by the Owner, to the extent due within five (5) days of receipt of written notice from Contractor notifying Owner of such failure, or (ii) defaults in the performance of any of Owner's other obligations hereunder and such default is not cured within ten (10) days after written notice thereof from Contractor to Owner specifying the nature of the default. Upon such default, Contractor may: (i) suspend or cease some or all further Project until Owner cures such default, which in the case of non-payment shall include payment of all sums in arrears plus interest thereon at a rate equal to Prime rate plus ten percent per annum (the "**Default Rate**") from its due date; or (ii) terminate this Agreement by written notice to Owner and in such event Contractor shall be entitled to recover from Owner the sum of (A) the unpaid balance of the Contract Sum allocable to the Project completed and materials delivered to the date of such termination (whether or not vouchers for such Project were submitted prior to such termination), plus (B) the cost of any materials, supplies or equipment ordered but not delivered that cannot be returned for full credit.

b. **AS A MATERIAL NEGOTIATED PROVISION OF THIS AGREEMENT, EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO RECOVER FROM THE OTHER PARTY ANY DAMAGES NOT PROVIDED FOR IN THIS AGREEMENT. WITHOUT LIMITING THE FOREGOING, EACH PARTY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO RECOVER ANY PUNITIVE, EXEMPLARY, TREBLE, OR OTHER DAMAGES IN EXCESS OF SUCH PARTY'S ACTUAL DAMAGES AS PROVIDED FOR IN THIS AGREEMENT, EXCEPT THOSE CAUSED BY FRAUD OR MISAPPROPRIATION OF FUNDS.**

c. Upon any breach of this Agreement by Contractor which is not cured within ten (10) business days after Owner provides written notice to Contractor of such breach, Owner may terminate this Agreement and seek all rights and remedies to which Owner is entitled under this Agreement or pursuant to applicable law. Further, the Owner may terminate this Agreement if the contractor:

1) persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;
2) fails to make payment to subcontractors for materials or labor in accordance with the respective agreements between the contractor and subcontractors

3) persistently disregards laws, ordinances, or rules, regulations or orders of public authority having jurisdiction;

4) otherwise is guilty of breach of this Agreement

d. Following any termination of this Agreement, Contractor shall provide to Owner a final payment request, which provides for the prorated portion of the Contract Sum as it relates to all work performed through the date of termination, as well as the cost of any materials which Contractor ordered through the date of termination and provided to Owner, and, within ten (10) business days after Owner's receipt of a valid final payment request, Owner shall pay to Contractor the amount due on such valid final payment request.

19. <u>SOLVENCY</u>. If Contractor becomes insolvent, fails to promptly pay its Subcontractors or institutes or has instituted a case against it under Title 11 of the United States Code which is not removed within ninety (90) days, or makes a general assignment for the benefit of creditors, or a receiver is appointed for the benefit of its creditors, or a receiver is appointed on account of its insolvency, Owner shall be entitled to receive adequate assurance of future performance by Contractor. Failure to comply with this request within twenty (20) days after the request therefor, shall entitle Owner to terminate this Agreement.

20. <u>PERFORMANCE OF PROJECT</u>. In performing the Project, Contractor shall keep the Property and surrounding areas free of accumulated debris at all times. Upon completion of the Project. Contractor shall remove all its waste materials and rubbish from, in and about the Property, as well as its tools, construction equipment, machinery and surplus materials and leave the House in "professionally cleaned" condition.

21. <u>PROPERTY DAMAGE</u>. Contractor shall repair all areas of the Property which were disturbed by Contractor's performance of the Project; *<u>provided</u>*, *<u>however</u>*, that Contractor shall not be obligated to repair damage which was foreseeable due to construction activities which are typical in the performance of the specific Project.

22. <u>COMPLIANCE WITH LAW</u>. Contractor covenants and agrees to comply with all rules, regulations, requirements, and ordinances of all governmental authorities. Owner shall not be responsible for the loss of or damage to materials, tools, equipment, appliances, or other personal property, owned, rented, or used by Contractor or any Subcontractor, for whatever cause except where caused by Owner.

23. <u>DISCIPLINE</u>. Contractor shall use commercially reasonable efforts to enforce strict discipline and good order among its employees and shall instruct its Subcontractors to do so with respect to their employees. Contractor shall not employ or knowingly permit any Subcontractor to employ on the Project any unfit person or anyone not skilled in the tasks assigned to such person.

24. <u>TAXES</u>. Contractor shall pay all sales, consumer, use or other similar taxes for the Project or portions thereof; *<u>provided</u>*, *<u>however</u>*, that Contractor shall not be obligated to pay any taxes, levies, or other damages based upon the value of the Property or any on any increase in valuation of the Property as a result of the improvements made under this Agreement. However, the Contract Sum does not include and has been computed on the assumption that there are no taxes imposed on Contractor by the municipality in which the Project is located, including any business privilege, mercantile, service privilege, gross receipts or similar tax, based on or measured by the gross or net income to be paid to Contractor under this Agreement. Should any such tax be imposed on Contractor, Owner shall promptly reimburse Contractor for such tax, and such amount shall automatically become part of the Contract Sum.

25. SAFETY PRECAUTIONS. Contractor shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the Project with respect to Contractor's employees and the general public. Contractor shall take all precautions reasonably necessary and customarily taken by residential contractors to provide for the safety of persons and prevent injury, damage, or loss of the property of Owner or third parties.

26. PHOTOGRAPHS. Owner authorizes Contractor to photograph the Property (including the House and Improvements) and the exterior and interior of the House and other Improvements for use in Contractor's business.

27. INDEMNIFICATION. Contractor agrees to indemnify, defend, and hold harmless Owner, Architect, and their respective partners, heirs, successors, assigns, affiliates, directors, officers, shareholders, employees and agents (the "**Indemnified Parties**") from and against any and all loss, cost, claim, damage, suits, damage, judgment, expense, liability, and charge of every kind and nature, both legal and otherwise, whether direct or indirect ("**Costs**"), arising out of, resulting from or related to the Project, a breach by Contractor of its obligations under this Agreement, or to the acts or omissions of Contractor, a Subcontractor, suppliers or any other entity for whose acts or omissions Contractor or a Subcontractor may be liable. The obligations of Contractor under this indemnification shall not, however, apply to an Indemnified Party whose negligence or malicious acts are the cause of the claim or matters in question. This indemnity includes acts of Contractor and Subcontractors for which Contractor and Owner, or either of them, is or are liable because of a non-delegable statutory duty. The foregoing indemnity shall not be affected by any contributory negligence of Owner. Contractor shall promptly advise Owner in writing of any action, administrative or legal proceeding or investigation as to which this indemnification may apply, and Contractor, at Contractor's expense, shall assume on behalf of the Indemnified Party in question and conduct with due diligence and in good faith the defense thereof with counsel satisfactory to the Indemnified Party; *provided*, that the Indemnified Party shall have the right to be represented therein by advisory counsel of its own selection and at its own expense; and *provided further*, that if the defendants in any such action include both Contractor and the Indemnified Party and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to, or inconsistent with, those available to Contractor, the Indemnified Party shall have the right to select separate counsel to participate in the defense of such action on its own behalf at Contractor's expense. In the event of failure by Contractor to fully perform in accordance with this indemnification paragraph, the Indemnified Party, at its option, and without relieving Contractor of its obligations hereunder, may so perform, but all costs and expenses so incurred by the Indemnified Party in that event shall be immediately reimbursed by Contractor to the Indemnified Party. The obligations of Contractor under this Section 27 shall survive the expiration or early termination of the Agreement.

28. INCORPORATION OF RESIDENTIAL CONSTRUCTION PERFORMANCE GUIDELINES. Notwithstanding anything to the contrary contained in this Agreement (including without limitation anything contained in Sections 3 and 10), the National Association of Home Builders Residential Construction Performance Guidelines attached hereto as Exhibit E (the "**Finishing Guidelines**" are hereby incorporated by reference and made a part of this Agreement. In the event of any conflict between this Agreement and the Finishing Guidelines, the Finishing Guidelines shall prevail.

29. COUNTERPARTS AND ELECTRONIC SIGNATURES. This Agreement may be executed by the parties hereto in counterparts, all of which shall be deemed to constitute one agreement. Any signature of Owner and/or Contractor which is delivered by facsimile or electronic mail through portable document format shall constitute a legal, valid and binding signature of such party as if an original paper copy had been delivered.

[SIGNATURES TO FOLLOW ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**OWNER:**

DocuSigned by:
FC86448C93DD409...

Print Name: Peter Mortimer

DocuSigned by:
Amanda Mortimer
CF43E193A505457...

Print Name: Amanda Mortimer

**CONTRACTOR:**

**BLUE FLAG CONSTRUCTION, LLC**

DocuSigned by:
By: Richard J. Craddock
C84F72BC22774A9...

Name: Richard J. Craddock
Title: President

**EXHIBIT A**

**Plans**

Attached.

**EXHIBIT B**

**Specifications**

Attached.

**EXHIBIT C**

**Payment Schedule**

**EXHIBIT D**

**Warranty**

Attached.

**EXHIBIT E**

**NAHB Residential Construction Performance Guidelines**

Attached.